For U.S. Supreme Court briefs, see:
1997 WL 523863 (Pet.Brief)
1997 WL 597299 (Resp.Brief)
199 WL 668161 (Reply.Brief)
753Justice KENNEDY
delivered the opinion of the Court.
In this commercial suit against an Indian Tribe, the Oklahoma Court of Civil Appeals rejected the Tribe’s claim of sovereign immunity. Our case law to date often recites the rule of tribal immunity from suit. While these precedents rest on early cases that assumed immunity without extensive reasoning, we adhere to these decisions and reverse the judgment.
I
Petitioner Kiowa Tribe is an Indian Tribe recognized by the Federal Government. The Tribe owns land in Oklahoma, and, in addition, the United States holds land in that State in trust for the Tribe. Though the record is vague about some key details, the facts appear to be as follows: In 1990, a tribal entity called the Kiowa Industrial Development Commission agreed to buy from respondent Manufacturing Technologies, Inc., certain stock issued by Clinton-Sherman Aviation, Inc. On April 3, 1990, the then-chairman of the Tribe’s business committee signed a promissory note in the name of the Tribe. By its note, the Tribe agreed to pay Manufacturing Technologies $285,000 plus interest. The face of the note recites it was signed at Carnegie, Oklahoma, | Ts^whore the Tribe has a complex on land held in trust for the Tribe. According to respondent, how'ever, the Tribe executed and delivered the note to Manufacturing Technologies in Oklahoma City, beyond the Tribe’s lands, and the note obligated the Tribe to make its payments in Oklahoma City. The note does not specify a governing law. In a paragraph entitled “Waivers and Governing Law,” it does provide: “Nothing in this Note subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma.” App. 14.
The Tribe defaulted; respondent sued on the note in state court; and the Tribe moved to dismiss for lack of jurisdiction, relying in part on its sovereign immunity from suit. The trial court denied the motion and entered judgment for respondent. The Oklahoma Court of Civil Appeals affirmed, holding Indian tribes are subject to suit in state court for breaches of contract involving off-reservation commercial conduct. The Oklahoma Supreme Court declined to review the judgment, and we granted certiorari. 521 U.S. 1117, 117 S.Ct. 2506, 138 L.Ed.2d 1010 (1997).
II
As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. See Three Affiliated Tribes of Fort Berthold Reservation v. Wold, Engineering, 476 U.S. 877, 890, 106 S.Ct. 2305, 2312-2313, 90 L.Ed.2d 881 (1986); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1676-1677, 56 L.Ed.2d 106 (1978); United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512, 60 *1703 S.Ct. 653, 656, 84 L.Ed. 894 (1940) (USF & G). To date, our cases have sustained tribal immunity from suit without drawing a distinction based on where the tribal activities occurred. In one case, a state court had asserted jurisdiction over tribal fishing “both on and off its reservation.” Puyallup Tribe, Inc. v. Department of Game of Wash., 433 U.S. 165, 167, 97 S.Ct. 2616, 2618, 53 L.Ed.2d 667 (1977). We held the Tribe’s claim of immunity was “well founded,” though we did not discuss the relevance of where the fishing had taken place. Id., at 168, 172, 97 S.Ct., at 2619, 2621. Nor have we yet drawn a distinction between governmental 17SSand commercial activities of a tribe. See, e.g., ibid. (recognizing tribal immunity for fishing, which may well be a commercial activity); Oklahoma Tax Comm’n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (recognizing tribal immunity from suit over taxation of cigarette sales); USF & G, supra, (recognizing tribal immunity for coal-mining lease). Though respondent asks us to confine immunity from suit to transactions on reservations and to governmental activities, our precedents have not drawn these distinctions.
Our eases allowing States to apply their substantive laws to tribal activities are not to the contrary. We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country. See Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-149, 93 S.Ct. 1267, 1270-1271, 36 L.Ed.2d 114 (1973); see also Organized Village of Kake v. Egan, 369 U.S. 60, 75, 82 S.Ct. 562, 570-571, 7 L.Ed.2d 573 (1962). To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit. In Potawatomi, for example, we reaffirmed that while Oklahoma may tax cigarette sales by a Tribe’s store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid state taxes. 498 U.S., at 510, 111 S.Ct., at 909-910. There is a difference between the right to demand compliance with state laws and the means available to enforce them. See id., at 514, 111 S.Ct., at 911-912.
The Oklahoma Court of Civil Appeals nonetheless believed federal law did not mandate tribal immunity, resting its holding on the decision in Hoover v. Kiowa Tribe of Oklahoma, 909 P.2d 59 (Okla.1995), cert. denied, 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 779 (1996). In Hoover, the Oklahoma Supreme Court held that tribal immunity for off-reservation commercial activity, like the decision not to exercise jurisdiction over a sister State, is solely a matter of comity. 909 P.2d, at 62 (citing Nevada v. Hall, 440 U.S. 410, 426, 99 S.Ct. 1182, 1191, 59 L.Ed.2d 416 (1979)). According to Hoover, because the State holds itself open to breach of contract suits, it may allow its citizens to sue other sovereigns acting within the State. We 17sghave often noted, however, that the immunity possessed by Indian tribes is not coextensive with that of the States. See, e.g., Blatchford. v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). In Blatchford, we distinguished state sovereign immunity from tribal sovereign immunity, as tribes were not at the Constitutional Convention. They were thus not parties to the “mutuality of ... concession” that “makes the States’ surrender of immunity from suit by sister States plausible.” Id., at 782, 111 S.Ct, at 2582; accord, Idaho v. Coeur d’Alene Tribe of Idaho, 521 U.S. 261, 268-269, 117 S.Ct. 2028, 2033-2034, 138 L.Ed.2d 438 (1997). So tribal immunity is a matter of federal law and is not subject to diminution by the States. Three Affiliated Tribes, supra, at 891, 106 S.Ct., at 2313; Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 154, 100 S.Ct. 2069, 2081-2082, 65 L.Ed.2d 10 (1980).
Though the doctrine of tribal immunity is settled law and controls this case, we note that it developed almost by accident. The doctrine is said by some of our own opinions to rest on the Court’s opinion in Turner v. United States, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919). See, e.g., Potawatomi, supra, at 510, 111 S.Ct., at 909-910. Though Turner is indeed cited as authority for the immunity, examination shows it simply does not stand for that proposition. The case arose on lands within the Creek Nation’s “public domain” and subject to “the powers *1704 of [the] sovereign people.” 248 U.S., at 855, 39 S.Ct., at 109. The Creek Nation gave each individual Creek grazing rights to a portion of the Creek Nation’s public lands, and 100 Creeks in turn leased their grazing rights to Turner, a non-Indian. He built a long fence around the land, but a mob of Creek Indians tore the fence down. Congress then passed a law allowing Turner to sue the Creek Nation in the Court of Claims. The Court of Claims dismissed Turner’s suit, and the Court, in an opinion by Justice Bran-déis, affirmed. The Court stated: “The fundamental obstacle to recovery is not the immunity of a sovereign to suit, but the lack of a substantive right to recover the damages resulting from failure of a government or its ]757officers to keep the peace.” Id,, at 358, 39 S.Ct., at 110. “No such liability existed by the general law.” Id., at 357, 39 S.Ct., at 110.
The quoted language is the heart of Turner. It is, at best, an assumption of immunity for the sake of argument, not a reasoned statement of doctrine. One cannot even say the Court or Congress assumed the congressional enactment was needed to overcome tribal immunity. There was a very different reason why Congress had to pass the Act: “The tribal government had been dissolved. Without authorization from Congress, the Nation could not then have been sued in any court; at least without its consent.” Id.., at 358, 39 S.Ct., at 110. The fact of tribal dissolution, not its sovereign status, was the predicate for the legislation authorizing suit. Turner, then, is but a slender reed for supporting the principle of tribal sovereign immunity.
Turner ⅛ passing reference to immunity, however, did become an explicit holding that tribes had immunity from suit. We so held in USF & G, saying: “These Indian Nations are exempt from suit without Congressional authorization.” 309 U.S., at 512, 60 S.Ct., at 656 (citing Turner, supra, at 358, 39 S.Ct., at 110). As sovereigns or quasi sovereigns, the Indian Nations enjoyed immunity “from judicial attack” absent consent to be sued. 309 U.S., at 513-514, 60 S.Ct., at 656-657. Later cases, albeit with little analysis, reiterated the doctrine. E.g., Puyallup, 433 U.S., at 167, 172-173, 97 S.Ct., at 2621-2622; Santa Clara Pueblo, 436 U.S., at 58, 98 S.Ct., at 1676-1677; Three Affiliated Tribes, 476 U.S., at 890-891, 106 S.Ct., at 2312-2313; Blatchford, supra, at 782, 111 S.Ct., at 2582-2583; Coeur d’Alene, supra, at 268, 117 S.Ct. at 2033-2034.
The doctrine of tribal immunity came under attack a few years ago in Potawato-mi, supra. The petitioner there asked us to abandon or at least narrow the doctrine because tribal businesses had become far removed from tribal self-governance and internal affairs. We retained the doctrine, however, on the theory that Congress had failed to abrogate it in order to promote economic development and tribal self-sufficiency. Id,, at 510, 111 S.Ct., at 909-910. The rationale, it must be said, can be challenged as inapposite to modem, wide-ranging tribal 1758enterprises extending well beyond traditional tribal customs and activities. Justice STEVENS, in a separate opinion, criticized tribal immunity as “founded upon an anachronistic fiction” and suggested it might not extend to off-reservation commercial activity. Id., at 514-515, 111 S.Ct., at 911-913 (concurring opinion).
There are reasons to doubt the wisdom of perpetuating the doctrine. At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect nascent tribal governments from encroachments by States. In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation’s commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. See Mescalero Apache Tribe v. Janes, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); Potawatomi, supra; Seminole Tribe of Fla. v . Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.
*1705 These considerations might suggest a need to abrogate tribal immunity, at least as an overarching rule. Respondent does not ask us to repudiate the principle outright, but suggests instead that we confine it to reservations or to noncommercial activities. We decline to draw this distinction in this case, as we defer to the role Congress may wish to exercise in this important judgment.
Congress has acted against the background of our decisions. It has restricted tribal immunity from suit in limited circumstances. See, e.g., 25 U.S.C. § 45Qf(c)(3) (mandatory liability insurance); § 2710(d)(7)(A)(ii) (gaming activities). And in other statutes it has declared an intention not to alter it. See, e.g., § 450n (nothing in financial-assistance program is to be construed as “affecting, modifying, diminishing, or otherwise impairing the sovereign immunity from suit enjoyed by an Indian tribe”); see also Potawatomi, 498 1759 U.S., at 510, 111 S.Ct., at 909-910 (discussing Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. § 1451 et seq.).
In considering Congress’ role in reforming tribal immunity, we find instructive the problems of sovereign immunity for foreign countries. As with tribal immunity, foreign sovereign immunity began as a judicial doctrine. Chief Justice Marshall held that United States courts had no jurisdiction over an armed ship of a foreign state, even while in an American port. Schooner Exchange v. McFaddon, 7 Cranch 116, 3 L.Ed. 287 (1812). While the holding was narrow, “that opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns.” Verlinden B. V. v. Central Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). In 1952, the State Department issued what came to be known as the Tate Letter, announcing the policy of denying immunity for the commercial acts of a foreign nation. See id., at 486-487, 103 S.Ct., at 1967-1968. Difficulties in implementing the principle led Congress in 1976 to enact the Foreign Sovereign Immunities Act, resulting in more predictable and precise rules. See id., at 488-489, 103 S.Ct., at 1968-1969 (discussing the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1604, 1605, 1607).
Like foreign sovereign immunity, tribal immunity is a matter of federal law'. Verlinden, supra, at 486, 103 S.Ct., at 1967-1968. Although the Court has taken the lead in drawing the bounds of tribal immunity, Congress, subject to constitutional limitations, can alter its limits through explicit legislation. See, e.g., Santa Clara. Pueblo, supra, at 58, 98 S.Ct., at 1676-1677.
In both fields, Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests. The capacity of the Legislative Branch to address the issue by comprehensive legislation counsels some caution by us in this area. Congress “has occasionally authorized limited classes of suits against Indian tribes” and “has always been at liberty to dispense with such tribal immunity or to limit it.” Potawatomi, supra, at 510, 111 S.Ct., at 910. It has not yet done so.
_Jj¡0In light of these concerns, we decline to revisit our case law and choose to defer to Congress. Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation. Congress has not abrogated this immunity, nor has petitioner waived it, so the immunity governs this case. The contrary decision of the Oklahoma Court of Civil Appeals is

Reversed.